# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| GRANT A. GOMEZ and LANIE L. GOMEZ, on behalf of themselves and all others similarly situated, | Civil No. 09-1818 (JRT/FLN) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING MOTIONS TO DISMISS** |
| WELLS FARGO BANK N.A. and VALUATION INFORMATION TECHNOLOGY, LLC, d/b/a Rels Valuation, | |
| Defendants. | |

Craig R. Spiegel, **HAGENS BERMAN SOBOL SHAPIRO LLP**, 1918 Eighth Avenue, Suite 3300, Seattle, WA 98101; and Renae D. Steiner and Scott W. Carlson, **HEINS MILLS & OLSON, P.L.C.**, 310 Clifton Avenue, Minneapolis, MN 55403, for plaintiffs.

David L. Permut, **GOODWIN PROCTER LLP**, 901 New York Avenue NW, Washington, DC 20001; and Aaron D. Van Oort, **FAEGRE & BENSON LLP**, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-3901, for defendant Wells Fargo Bank, N.A.

Elizabeth T. Ferrick and Charles A. Newman, **SONNENSCHEIN NATH & ROSENTHAL LLP**, One Metropolitan Square, Suite 3000, 211 North Broadway, St. Louis, MO 63102; and Alan H. Maclin, **BRIGGS & MORGAN, P.A.**, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for defendant Valuation Information Technology, LLC d/b/a Rels Valuation.

Plaintiffs Grant A. Gomez and Lanie L. Gomez own a home in Arizona that they financed and later refinanced through Wells Fargo Bank ("Wells Fargo"). Valuation

Information Technology LLC, doing business as Rels Valuation ("Rels"), provided the appraisals of the Gomezes' home through independent appraisers. The Gomezes brought this action against Wells Fargo and Rels, alleging RICO conspiracy, violations of the Real Estate Settlement Procedures Act, unjust enrichment, violation of the California Unfair Competition Law, and violation of Arizona's RICO statute. Wells Fargo and Rels filed separate motions to dismiss the second amended complaint. For the reasons stated below, the Court grants the motions.

## BACKGROUND

Wells Fargo is chartered in South Dakota and has its headquarters in California. (Second Am. Compl. ("SAC") ¶ 9, Docket No. 27.) Wells Fargo has a residential mortgage servicing portfolio of over $1 trillion. (Id. ¶ 17.) Wells Fargo & Co. is the parent of Wells Fargo. (Id. ¶ 11.) Rels Valuation is an Iowa LLC and has its headquarters in Minnesota. (Id.) Rels "is a provider of real property appraisals."[1] (Id.) Rels is a joint venture between a subsidiary of Wells Fargo & Co. and a subsidiary of First American Real Estate Solutions ("First American"). (Id.) The Wells Fargo & Co. subsidiary owns 49.9% of Rels, and the First American subsidiary owns 50.1%. (Id. ¶ 14.)

Grant and Lanie Gomez are a married couple residing in Arizona. (Second Am. Compl. ("SAC") ¶ 8, Docket No. 27.) On or about March 1, 2006, the Gomezes

---

[1] According to Wells Fargo, Rels is an "appraisal management company," and is involved "in managing the procurement and production of appraisals for mortgage lenders and other companies." (Mem. in Supp. of Wells Fargo's Restated Mot. to Dismiss at 1, Docket No. 78.)

purchased a home in Scottsdale, Arizona, and they took out a mortgage from Wells Fargo to finance the purchase. (*Id.* ¶ 47.) The Gomezes and their settlement agent signed a HUD-1 Settlement Statement for their home purchase on March 2, 2006. (March 2006 HUD-1, Newman Aff. Ex. A, Docket No. 69.) A HUD-1 Settlement Statement ("HUD-1") is a statement "setting forth settlement charges in connection with either the purchase or the refinancing" of a residential property. 24 C.F.R. § 3500.2(b). Line 803 of the HUD-1 discloses that the Gomezes would incur an appraisal fee of $375, to be paid to Rels. (March 2006 HUD-1 at 2, Newman Aff. Ex. A, Docket No. 69.) Wells Fargo required the Gomezes to use Rels for the appraisal. (SAC ¶¶ 22, 43, Docket No. 27.)

On or about March 1, 2007, the Gomezes refinanced their mortgage through Wells Fargo. (*Id.* ¶ 40.) On or about February 22, 2007, Wells Fargo sent the Gomezes an initial packet of loan disclosure documents, including a HUD-1 Good Faith Estimate. (*Id.* ¶ 42.) The HUD-1 Good Faith Estimate disclosed that Wells Fargo had a business relationship with Rels and estimated that the charges for Rels' appraisal would be between $50 and $650. (*Id.* ¶ 44.) On March 5, 2007, the Gomezes and their settlement agent signed the HUD-1 for their refinancing. (*Id.* ¶ 46; March 2007 HUD-1, Newman Aff. Ex. A, Docket No. 69.) Line 803 of the HUD-1 discloses that the Gomezes would incur an appraisal fee of $495, to be paid to Rels. (March 2007 HUD-1 at 2, Newman Aff. Ex. A, Docket No. 69.)

The Gomezes make two central allegations relating to the March 2007 refinancing transaction.[2]  First, the Gomezes allege that Rels "performed no work and provided no appraisal services toward completion of the Gomezes' appraisal."  (SAC ¶ 52, Docket No. 27.)  Instead, the Gomezes allege, Rels hired an appraiser to conduct the appraisal, but paid the appraiser $200 or less, and "skimmed the difference" between that amount and the amount disclosed in the HUD-1.  (*Id.* ¶ 49.)  The Gomezes allege that Rels forces third-party appraisers "to charge Rels Valuation an amount for appraisal services far under the prevailing market rate for appraisals," and that those rates are "so low that a proper appraisal cannot be performed."  (*Id.* ¶¶ 1(c)-(d), 30.)  The Gomezes allege that Rels and Wells Fargo work in concert to use Wells Fargo's market power to obtain appraisal services from third-party appraisers at below-market rates:

> With the growing number of appraisers and increased competition in the appraisal marketplace, the environment was ripe for a market force such as Wells Fargo to exert its will on appraisers, forcing "independent" appraisers to lower the amounts they charged on Wells Fargo loans; all the while **Wells Fargo maintained market rates to its borrowers** and kept the excess, all for no additional services rendered.

(*Id.* ¶ 21 (emphasis added).)

Second, the Gomezes allege that "Wells Fargo was able to dictate and control the outcome of the Gomezes' appraisal through its affiliated relationship with Rels," and therefore "could close whatever loans it wanted to, irrespective of the actual market values of the properties on which it was lending."  (*Id.* ¶¶ 22, 53.)

---

[2] Some of the allegations may also apply to the original mortgage transaction.  (*See, e.g.*, SAC ¶ 48, Docket No. 27 ("The final settlement statement of March 2, 2006, lists an appraisal fee of $375 to Rels Valuation.  Again, this statement is false as Rels Valuation did not undertake an appraisal.").)  Most of the allegations relate to the 2007 refinancing, however, and therefore the Court focuses its analysis on that transaction.

On January 30, 2009, the Gomezes filed a complaint against Wells Fargo and Rels in the United States District Court for the District of Arizona. (Class Action Compl., Docket No. 1.) While defendants' motions to dismiss were pending, that court granted defendants' joint motion to transfer, and the Gomezes subsequently filed a second amended complaint with this Court. (Docket No. 27.)

The second amended complaint alleges six causes of action. Count I alleges that Wells Fargo and Rels engaged in a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). (SAC ¶¶ 85-87, Docket No. 27.) Count I identifies two RICO enterprises: the "Wells Fargo Appraisal Enterprise" and the "Wells Fargo Enterprise." (*Id.* ¶¶ 88, 95.) Count II alleges that Rels violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607, by marking up appraisal fees for appraisals conducted by third parties. (*Id.* ¶¶ 118-24.) Count III alleges that Wells Fargo and Rels violated Section 8(b) of RESPA when Rels gave Wells Fargo a thing of value – "control over the appraisal process and results" – pursuant to an agreement that Wells Fargo would refer appraisal business to Rels. (*Id.* ¶¶ 126-29.) Count IV alleges unjust enrichment against Rels. (*Id.* ¶¶ 131-36.) Count V alleges that Wells Fargo violated the California Unfair Competition Law ("UCL"). (*Id.* ¶¶ 138-49.) Count VI alleges that Wells Fargo and Rels engaged in a pattern of unlawful activity in violation of Arizona's RICO statute. (*Id.* ¶¶ 139-64.)

In September 2009, Rels and Wells Fargo filed renewed motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim. (Docket Nos. 66, 76.)

# ANALYSIS

## I.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to file a motion to dismiss for "lack of jurisdiction over the subject matter."   In determining whether jurisdiction exists, the Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990).  It is the plaintiff's burden to establish that jurisdiction does in fact exist.  *Id.* If the motion to dismiss under Rule 12(b)(1) is based on a deficiency in the pleadings, the "standard of review is the same standard we apply in Rule 12(b)(6) cases." *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007).   If the Court finds that jurisdiction is not present, it is obligated to dismiss the matter.  Fed. R. Civ. P. 12(h); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583-84 (1999).

In reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true, and construes the pleadings in a light most favorable to the non-moving party.  *See, e.g.*, *Bhd. of Maint. of Way Employees v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 638 (8th Cir. 2001).  To survive a motion to dismiss, however, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  That is, to avoid dismissal, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*
"Where a complaint pleads facts that are merely consistent with a defendant's liability, it
stops short of the line between possibility and plausibility," and therefore, must be
dismissed. *Id.* (internal quotation marks omitted).

## II.     DEFENDANTS' MOTIONS TO DISMISS

Wells Fargo and Rels raise several arguments in support of their motions to
dismiss.  The Court first addresses whether the Gomezes have Article III and RICO
standing, and then addresses the merits of the Gomezes' RESPA claims.

### A.     Standing

Wells Fargo and Rels argue that the Court lacks subject matter jurisdiction over
the Gomezes claims because the Gomezes lack Article III standing as well as statutory
standing to bring RICO and UCL claims.  The Court addresses these arguments in turn.

#### 1.     Article III Standing

"To show Article III standing, a plaintiff has the burden of proving: (1) that he or
she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the
challenged conduct, and (3) that the injury likely will be redressed by a favorable
decision." *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1157 (8th Cir. 2008)
(internal quotation marks omitted).  An injury-in-fact is "an invasion of a legally
protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).

Defendants argue that the second amended complaint concedes that the Gomezes have not suffered a concrete injury because the complaint states that Wells Fargo "maintained market rates to its borrowers" for appraisals. (SAC ¶ 21, Docket No. 27.) Defendants argue that because the Gomezes are "in no worse position as a result of the alleged 'scheme,' . . . their 'injury' is purely conjectural." (Rels' Mem. in Supp. of Restated Mot. to Dismiss at 6, Docket No. 68.) The Gomezes offer two arguments in response.

First, the Gomezes argue that Wells Fargo's practice of "forcing purportedly independent appraisers to lower the fees they charged on Wells Fargo loans" had the effect of "resetting the market at a lower rate – while Wells Fargo maintained the prior market rates to its borrowers and kept the excess for no additional services rendered." (Pls.' Opp'n to Def. Wells Fargo Bank's Restated Mot. to Dismiss at 3, Docket No. 85.) The second amended complaint, however, does not allege that Wells Fargo "reset" the market at a lower rate. It unequivocally states that Wells Fargo charged its borrowers "market rates." (SAC ¶ 21, Docket No. 27.)

Second, the Gomezes argue that they suffered an injury-in-fact because "Rels d[id] not pass on the reduced appraisal fees – the new market rate – to the home buyer." (Pls.' Opp'n to Def. Rels' Restated Mot. to Dismiss at 4, Docket No. 83.) The second amended complaint states that "Rels Valuation does not pass on the reduced appraisal fees to the

home buyer," but it does not allege that the defendants' conduct created a "new market rate." (*See* SAC ¶ 32, Docket No. 27.)

The Court finds that the Gomezes have alleged facts sufficient to establish noneconomic injury sufficient to establish Article III standing.[3]  *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (recognizing that noneconomic injury may be sufficient to establish Article III standing).

## a.    RESPA Claims

"Congress unequivocally has the power to create new interests the invasion of which will confer standing."  *Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 985 (6th Cir. 2009); *see Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.").  That power, however, is limited by the requirement that "the party seeking review be himself among the injured."  *Morton*, 405 U.S. at 734.

Section 8(a) and (b) of RESPA prohibit kickbacks and unearned fees in real estate settlement agreements.   12 U.S.C. § 2607(a)-(b).   Section 8(d)(2) of RESPA makes anyone violating the kickback and unearned fee provisions "jointly and severally liable to

_____

[3] The parties do not address whether the Gomezes have Article III standing to bring their unjust enrichment claim against Rels.  The Gomezes' contention that "it would be unjust for Rels to retain the marked-up fee it charged for Plaintiffs' appraisal, when in truth and fact, it paid only a small portion of this fee to the actual appraiser, who did all the work," (Pls.' Opp'n to Def. Rels' Restated Mot. to Dismiss at 36, Docket No. 83), suggests that the **appraisers**, rather than the Gomezes, are the proper parties to bring an action against Rels for unjust enrichment.  Because the Court dismisses all of the remaining claims, the Court declines to exercise jurisdiction over Count IV and dismisses it without prejudice.  *See* 28 U.S.C. § 1367(c)(3); *Johnson v. City of Shorewood*, 360 F.3d 810, 819 (8th Cir. 2004).

the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service." *Id.* § 2607(d)(2). The Eighth Circuit describes the calculation of damages as "a loan-specific inquiry" that "demands that there be a determination of which settlement services are provided in connection with each real estate settlement." *Glover v. Standard Fed. Bank*, 283 F.3d 953, 965-66 (8th Cir. 2002).

Some district courts have held that, in the absence of economic injury, RESPA does not confer Article III standing. *See Mullinax v. Radian Guar., Inc.*, 311 F. Supp. 2d 474, 486 (M.D.N.C. 2004); *Moore v. Radian Group, Inc.*, 233 F. Supp. 2d 819, 819-20 (E.D. Tex. 2002); *Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1429 (S.D. Fla. 1997). These courts hold that if a defendant has not overcharged the plaintiff as part of a RESPA violation, the plaintiff has no injury-in-fact to support standing. *Mullinax*, 311 F. Supp. 2d at 486; *Moore*, 233 F. Supp. 2d at 826; *Morales*, 983 F. Supp. at 1429. These courts interpret Section 8(d)(2) to mean that a defendant is liable under RESPA for "three times the amount of the **overcharge**," rather than "three times the entire amount of the cost of the settlement service." *See Mullinax*, 311 F. Supp. 2d at 485-86 (emphasis added); *see also Moore*, 233 F. Supp. 2d at 824, 826; *Morales*, 983 F. Supp. at 1427. Under this interpretation, in the absence of injunctive relief, a court would also be unable to redress any alleged injury, because the plaintiff would not be entitled to statutory damages. *See Mullinax*, 311 F. Supp. 2d at 486.

Other courts, however, have concluded that a plain reading of Section 8(d)(2) entitles a plaintiff to damages equal to three times the full amount paid for the settlement

services at issue, regardless of whether there was an overcharge or whether the cost of the services was otherwise inflated, and the Court agrees with this reading of the statutory language. *See Carter*, 553 F.3d at 986 (stating that a defendant is liable not simply for overcharges, but "for the charges assessed the home buyer for settlement services **as a whole**").[4] As the Third Circuit explained in *Alston v. Countrywide Financial Corp.*,

> The plain language of RESPA section 8 does not require plaintiffs to allege an overcharge. The best indication of Congress's intent in this regard is the method it prescribed for the calculation of statutory damages in section 8(d)(2). Section 8(a) and section 8(b) proscribe specific types of abusive kickback and referral activities. *See id.* § 2607(a)-(b). Section 8(d)(2), in turn, creates a private right of action for a consumer whereby a defendant is liable for violations of section 8(a) and section 8(b) to the "person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of **any charge paid** for such settlement service." *See id.* § 2607(d)(2) (emphasis added). Critically, none of these provisions contains the word "overcharge" or otherwise implies that the plaintiff must allege that he or she paid more than he or she otherwise would have paid. *See id.* § 2607(a), (b), (d)(2). Instead, damages are fixed at three times the total charge paid by the consumer in exchange for a settlement service, and not merely any overcharge.

585 F.3d 753, 759-60 (3d Cir. 2009); *see also Edwards v. First Am. Corp.*, Nos. 08-56536, 08-56538, --- F.3d ---, ---, 2010 WL 2471900, at *3 (9th Cir. June 21, 2010) ("These RESPA provisions are clear. A person who is charged for a settlement service involved in a violation is entitled to three times the amount of any charge paid. The use of the term 'any' demonstrates that charges are neither restricted to a particular type of charge, such as an overcharge, nor limited to a specific part of the settlement service.

---

[4] *See also Spears v. Wash. Mut., Inc.*, No. C-08-868, 2009 WL 2761331, at *3 (N.D. Cal. Aug. 30, 2009); *Alexander v. Wash. Mut., Inc.*, No. 07-4426, 2008 WL 2600323, at *4-6 (E.D. Pa. June 30, 2008); *Edwards v. First Am. Corp.*, 517 F. Supp. 2d 1199, 1203-04 (C.D. Cal. 2007); *Yates v. All Am. Abstract Co.*, 487 F. Supp. 2d 579, 581-82 (E.D. Pa. 2007); *Kahrer v. Ameriquest Mortgage Co.*, 418 F. Supp. 2d 748, 756 (W.D. Pa. 2006).

Further, the term 'overcharge' does not exist anywhere within the text of the statute."). The word "'any' indicates that charges are neither restricted to a particular **type** of charge (such as an overcharge) nor limited to a specific **part**." *Carter*, 553 F.3d at 986. "[T]he phrase 'involved in the violation' modifies the immediately preceding term 'service,'" and therefore a defendant that violates RESPA is liable for damages equal to three times the amount that the plaintiff paid for the services that were involved in the violation. *See Alston*, 585 F.3d at 760 (internal quotation marks omitted). A homebuyer is therefore "entitled to three times any charge paid, but only for the service connected to the kickback or fee-split." *Id.* at 761.

Because the statutory language is clear, the Court does not consider Wells Fargo's argument that this reading of the statute is inconsistent with the purpose of RESPA. (*See* Def. Wells Fargo's Reply in Supp. of Restated Mot. to Dismiss at 3, Docket No. 92.) *See Alston*, 585 F.3d at 762 ("The District Court's reliance on purpose after having already discerned a contrary plain language meaning was error."); *see also Edwards*, --- F.3d at --, 2010 WL 2471900, at *3 ("Because the statutory text does not limit liability to instances in which a plaintiff is overcharged, we hold that Plaintiff has established an injury sufficient to satisfy Article III. The legislative history of RESPA supports our holding."); *cf.* 12 U.S.C. § 2601(a) ("The Congress finds that significant reforms in the real estate settlement process are needed **to insure that consumers** throughout the Nation **are provided with greater** and more timely **information on the** nature and **costs of the settlement process** and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country."

(emphases added)); *Edwards*, 517 F. Supp. 2d at 1203-04 (concluding that even if the statutory language is ambiguous, legislative history and other traditional tools of statutory interpretation confirm that a plaintiff "need not have suffered an overcharge to invoke the protection of RESPA").

The Gomezes' second amended complaint therefore satisfies the Article III standing requirements with respect to Counts II and III. *See Pucket*, 526 F.3d at 1157. First, the foregoing reading of Section 8(d)(2) demonstrates that "Congress vested consumers with the right to a kickback-free real estate settlement, with or without a resultant monetary injury," and therefore the Gomezes have alleged an injury-in-fact – violation of this right to a real estate settlement free from kickbacks and unearned fees.[5] *See Alston*, 585 F.3d at 762. Defendants' alleged invasion of this legally protected interest is concrete and particularized; it arises out of the Gomezes' own settlement costs set forth on the HUD-1s for their mortgage transactions. *See Defenders of Wildlife*, 504 U.S. at 560. Second, there is a causal relationship between defendants' challenged conduct – violations of RESPA – and the alleged injury. Third, even in the absence of

---

[5] The Gomezes also allege that defendants' conduct interfered with the quality of the appraisals. (*See* SAC ¶ 30, Docket No. 27 ("Independent appraisers have informed Wells Fargo and Rels Valuation that the rate demanded is so low that a proper appraisal cannot be performed. Wells Fargo knows this but nonetheless Wells Fargo insists on a vastly reduced rate, sacrificing quality for price.").)  The allegation that as a result of the scheme, consumers such as the Gomezes do "not get the benefit they pay for," (*see id.* ¶ 4), may also be sufficient to establish injury-in-fact. *Cf. Moore*, 233 F. Supp. 2d at 826 ("The plaintiffs do not contend that they paid too much for PMI.  They also do not contend that the PMI, or any other settlement service they received was of inferior quality.").  The complaint sufficiently alleges an injury-in-fact arising out of RESPA, and therefore the Court does reach the issue of whether conduct undermining the quality of appraisals, without more, would be sufficient to establish injury-in-fact to support the RESPA claims.

monetary injury in the form of an overcharge, the Court may redress the injury-in-fact by awarding treble damages under Section 8(d)(2).

### b.     Non-RESPA Claims

The Article III standing inquiry is claim-specific.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353-54 (2006); *Pagán v. Calderón*, 448 F.3d 16, 26 (1st Cir. 2006).  As established above, the RESPA claims "have substance sufficient to confer subject matter jurisdiction on the court."  *United Mine Workers of Am. v. Gibbs*, 38 U.S. 715, 725 (1966).  The Court finds that the RESPA claims and the remaining claims "derive from a common nucleus of operative fact," such that "the entire action before the court comprises but one constitutional 'case'" for purposes of Article III.  *See id.*  The Court therefore proceeds to determine whether the remaining claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, 13B Federal Practice and Procedure § 3531.16, at 362-63 (3d ed. 2008) ("Once a party is properly in court to challenge a particular injury-causing event, the range of permissible argument may properly be measured by prudential concerns. . . . [T]he court should be free to consider the arguments that seem to provide the most secure basis for decision without undue concern for the conceptual nexus between argument and injury.  It may be wisest to choose the argument most clearly anchored in the available facts, or the argument that is most secure in the law, or the argument that seems least dangerous in relation to interests broader than the immediate plaintiff's interests.").

### 2. Statutory Standing

Even where a plaintiff's alleged injury is sufficient to satisfy the Article III standing requirements, Congress may, by statute, "specif[y] a more stringent injury requirement" that the plaintiff must satisfy in order to pursue claims under that statute. *Metro Motors, LLC v. Nissan Motor Corp.*, 170 F. Supp. 2d 888, 890 (D. Minn. 2001).

### a. RICO Standing

The standing requirements to bring a claim under federal and Arizona RICO laws are more stringent than the injury-in-fact test for Article III standing. The federal RICO statute authorizes a suit by "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The Arizona RICO statute similarly authorizes a suit by "[a] person who sustains reasonably foreseeable injury to his person, business or property by a pattern of racketeering activity[.]" Ariz. Rev. Stat. § 13.2314.04(a). Therefore, "[t]o have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation."[6] *Asa-Brandt, Inc. v. ADM Investor Servs., Inc.*, 344 F.3d 738, 752 (8th Cir. 2003). "[A] showing of injury requires proof of **concrete financial loss**, and not mere injury to a valuable intangible property interest." *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 728 (8th Cir. 2004) (internal quotation marks omitted; emphasis added).

---

[6] The Gomezes seem to concede that there is no substantive difference between the Arizona and federal RICO standing requirements. (*See, e.g.*, Pls.' Opp'n to Def. Wells Fargo's Restated Mot. to Dismiss at 9, Docket No. 85.)

The Gomezes argue that they suffered a concrete financial loss because "Defendants reset the market by using their market power to force appraisers to lower their rates" and because "Plaintiffs allege that they were deceived into believing that the amount they paid to Rels was the actual cost of the appraisal." (Pls.' Opp'n to Def. Wells Fargo's Restated Mot. to Dismiss at 8, Docket No. 85.) The Gomezes claim that their damages are "the amount by which Defendants marked up the actual appraisal fees, regardless of fair market value." (*Id.* at 9.)

The allegations in the complaint effectively concede that the Gomezes did not suffer any concrete financial loss as a result of the alleged RICO violations. The complaint concedes that "Wells Fargo maintained **market rates** to its borrowers." (SAC ¶ 21, Docket No. 27 (emphasis added).) It is unclear how the Gomezes could have suffered any concrete financial loss by paying the market rate for their appraisals. In the absence of any alleged RICO violation, Wells Fargo would not have used its market presence "to exert its will on appraisers" to extract lower rates from them, (*see id.*), but instead would have paid appraisers at market rates. If Wells Fargo had paid appraisers at prevailing market rates, the Gomezes would have paid market rates – or higher. Therefore, the alleged RICO violations did not cause the Gomezes to suffer any "concrete financial loss." Financially, they would have been in the same position in the absence of the alleged RICO violations. To accept the Gomezes' theory of "concrete financial loss" would seem to open the door to RICO claims against any provider of consumer goods or services if that provider enjoys such a significant market share that it is able to extract

significant pricing concessions from its wholesalers. Such a result would eviscerate the applicable statutory standing language.

The cases the Gomezes cite in support of the contention that damages are measured by the amount of the alleged mark-up, "regardless of fair market value," are inapposite. (*See* Pls.' Opp'n to Def. Wells Fargo's Restated Mot. to Dismiss at 9, Docket No. 85.) In *Potomac Electric Power Co. v. Electric Motor & Supply, Inc.*, the plaintiff established RICO standing where it "bargained [for], paid [for], and allegedly did not receive" a particular service. 262 F.3d 260, 265 (4th Cir. 2001). Under those circumstances, the plaintiff had "been 'injured in its property' to the extent of the difference between the amount it paid and the amount it would have paid under specifications reflecting the actual work performed." *Id.* The parties allegedly had "bargained for expensive additional procedures" that had influenced the contract price but that had not been performed. *Id.* In *Hellenic Lines, Ltd. v. O'Hearn*, the plaintiff's RICO injury was "pa[ying] for services it never received, the proceeds of which were used to pay off [plaintiff's] employees and to bribe union officials." 523 F. Supp. 244, 248 (S.D.N.Y. 1981). The court found that even though the plaintiff "may have benefited from th[e] alleged scheme by insuring union peace and reliable service from [defendants], they were clearly injured if they had to pay padded bills and bribes." *Id.* (citation omitted). In *Potomac Electric* and *Hellenic Lines*, plaintiffs sufficiently alleged RICO injury by alleging that they paid for services they did not receive. Here, however, the Gomezes do not dispute that they received appraisal services or that Wells Fargo charged its borrowers market rates for those services.

Because the Gomezes fail to allege facts sufficient to establish RICO standing, they fail to state a claim under Counts I and VI, *see Bell v. Hood*, 327 U.S. 678, 682-83 (1946); *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 947-48, 951-53 (8th Cir. 1999), and the Court dismisses those counts with prejudice.

### b. California UCL Standing

The Gomezes allege that Wells Fargo's conduct violates California's Unfair Competition Law ("UCL"), Cal. Bus & Prof. Code §§ 17200 *et seq.* (SAC ¶ 140, Docket No. 27.) The standing requirement to bring a UCL claim is more stringent than the injury-in-fact test for Article III standing. *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 243-44 (Cal. Ct. App. 2010). In 2004, a California ballot initiative altered the UCL's standing requirement. *Palmer v. Stassinos*, 419 F. Supp. 2d 1151, 1154 (N.D. Cal. 2005). The ballot initiative

> limits the standing of plaintiffs to sue under the UCL. It eliminated the provision of Cal. Bus. & Prof. Code § 17204 authorizing initiation of a complaint by "any person acting for the interests of itself, its members, or the general public," substituting a provision for enforcement only by "any person who has suffered injury in fact **and has lost money or property as a result** of such unfair competition."

*Id.* (emphasis added) (quoting Cal. Bus. & Prof. Code § 17204 (2010)); *see also Californians for Disability Rights v. Mervyn's, LLC*, 138 P.3d 207, 209-10 (Cal. 2006). For the reasons set forth in the preceding subsection, the complaint cannot plausibly allege that the Gomezes "lost money or property" as a result of Wells Fargo's conduct.[7]

---

[7] The Court acknowledges that paragraph 144 of the second amended complaint alleges that "Plaintiffs and the Class have suffered injury in fact and have lost money or property as a

Because the Gomezes lack standing to bring their UCL claim, the Court dismisses Count V with prejudice for failure to state a claim.

### B.     RESPA (Counts II and III)

Defendants raise several arguments in support of their motion to dismiss the RESPA counts for failure to state a claim.  As a preliminary matter, defendants argue that the Gomezes' RESPA claims are time-barred, and the parties agree that in the absence of equitable tolling or equitable estoppel, the claims are time-barred.  *See* 12 U.S.C. § 2614. The Court concludes that, assuming the second amended complaint contains allegations sufficient to entitle the Gomezes to equitable tolling at the motion to dismiss stage, the Gomezes nonetheless fail to state a claim on Counts II and III.  Count II fails to allege that Rels engaged in fee-splitting, in violation of Section 8(b) of RESPA, and Count III fails to allege that the defendants exchanged a "thing of value" in violation of Section 8(a) of RESPA.  The Court therefore grants defendants' motions to dismiss Counts II and III.

#### a.     Section 8(b): Fee-Splitting

Section 8(b) of RESPA states that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed."  12

---

result of Wells Fargo's unlawful, unfair and/or deceptive business practices."  (SAC ¶ 144, Docket No. 27.)  Because the Gomezes concede elsewhere in the complaint that Wells Fargo charged borrowers market rates for appraisals, the allegation that Wells Fargo's alleged scheme caused the Gomezes to "los[e] money" fails to satisfy *Iqbal*'s plausibility standard.  *See* 129 S. Ct. at 1949.

U.S.C. § 2607(b). The complaint alleges that Rels violated Section 8(b) of RESPA by "charging appraisal fees in transactions in which they have not performed the appraisal which are far in excess of the actual cost of the appraisal charged by a third party," thereby "receiving a portion, split and percentage of a fee for the rendering of a real estate settlement service other than for services actually performed." (SAC ¶ 122, Docket No. 27.)

In *Haug v. Bank of America, N.A.*, the Eighth Circuit held that Section 8(b) "unambiguously requires at least two parties to share a settlement fee in order to violate the statute." 317 F.3d 832, 836 (8th Cir. 2003). The plaintiffs in *Haug* had alleged only "that Defendant charged Plaintiffs more for certain services than Defendant paid for them." *Id.* The court found that "[s]uch an overcharge, standing alone, does not violate Section 8(b) of RESPA." *Id.*

The Gomezes argue that because Rels is a joint venture between a subsidiary of First American and a subsidiary of Wells Fargo & Co., "the Wells Fargo entities share in the illegal fees by virtue of their ownership interest in Rels." (Pls.' Opp'n to Def. Rels' Restated Mot. to Dismiss at 33, Docket No. 83.) There are at least three flaws with this argument. First, the second amended complaint does not allege or even suggest this theory of fee-splitting. Rather, the complaint's allegation is premised on the conclusion that overcharges alone violate Section 8(b) – a conclusion the Eighth Circuit rejected in *Haug*. Second, the Gomezes do not cite any authority for their conclusion that a single business entity with multiple owners violates Section 8(b) when it overcharges borrowers, and the Court has not identified any case that makes this distinction. Third, if

the Court were to adopt the Gomezes' novel interpretation of Section 8(b), any corporation with multiple shareholders could potentially be engaged in fee-splitting simply by virtue of that ownership structure. That interpretation is implausible and inconsistent with *Haug*'s reading of Section 8(b).[8]

The Court finds that, in light of *Haug*, the second amended complaint's allegation that Rels engaged in fee splitting in violation of Section 8(b) of RESPA is not plausible on its face, and therefore the Court grants Rels' motion to dismiss Count II.

### b. Section 8(a): Thing of Value

Section 8(a) of RESPA prohibits persons from giving and accepting "any . . . thing of value pursuant to any agreement or understanding . . . that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). The phrase "thing of value" "includes any payment, advance, funds, loan, service, or other consideration." *Id.* § 2602(2); *see also* 24 C.F.R. § 3500.14(d). The second amended complaint alleges that "Wells Fargo accepted and . . . Rels . . . gave a thing of value – *i.e.*, control over the appraisal process and results – pursuant to an agreement that business incident to or part of a settlement service involving a federally related mortgage loan – *i.e.*, appraisal services – would be

---

[8] The Court recognizes that some courts have rejected *Haug*'s interpretation of Section 8(b). *See, e.g.*, *Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384, 389 (3d Cir. 2005); *Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49, 62 (2d Cir. 2004); *Sosa v. Chase Manhattan Mortgage Corp.*, 348 F.3d 979, 982-83 (11th Cir. 2003). *But see Krzalic v. Republic Title Co.*, 314 F.3d 875, 879 (7th Cir. 2002); *Boulware v. Crossland Mortgage Corp.*, 291 F.3d 261, 265-66 (4th Cir. 2002). To the extent that there is a circuit split on the issue of whether overcharges, without more, violate Section 8(b), the Eighth Circuit has already adopted a position on the issue and the Court is bound by that precedent.

referred to Rels . . . by Wells Fargo."  (SAC ¶ 127, Docket No. 27.)  The Gomezes explain that "Wells Fargo – working through Rels – can ensure that any loan it seeks to close is not derailed by an appraisal that does not come in at a value sufficient to secure the contemplated loan amount."  (Pls.' Opp'n to Def. Wells Fargo's Restated Mot. to Dismiss at 17, Docket No. 85.)

Rels could not have given Wells Fargo "control over the appraisal process" in consideration for an agreement that Wells Fargo would refer appraisal business to Rels because Wells Fargo is entitled by statute to control the appraisal process by selecting an appraiser to represent Wells Fargo's interests.  Section 8(c)(5) states that a lender may require a borrower to use a particular provider of settlement services, including an appraiser, where the "real estate appraiser [is] chosen by the lender to represent the lender's interest in a real estate transaction."  12 U.S.C. § 2607(c)(5)(i); *see also* 24 C.F.R. § 3500.15(b)(2).  The Gomezes concede that RESPA "allows Wells Fargo to require the use of Rels."  (SAC ¶ 35, Docket No. 27.)  Because Section 8(c)(5) allows Wells Fargo to select Rels "to represent [Wells Fargo's] interest" in the transaction, Wells Fargo had control over the appraisal process regardless of any referral arrangement.  The second amended complaint's allegation that "control over the appraisal process" is a thing of value is therefore not plausible, and the Court grants defendants' motions to dismiss Count III.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendant Valuation Information Technology, LLC's Motion to Dismiss [Docket No. 66], and Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss [Docket No. 76] are **GRANTED** as follows:

1.      Counts I, II, III, V, and IV are **DISMISSED with prejudice**; and

2.      Count IV is **DISMISSED without prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  August 30, 2010                     ____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                  United States District Judge